# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES EDWARD SCOTT,

      Plaintiff

v.

NAPCHARE, et al.,

      Defendants

Case No.: 3:19-cv-00347-ART-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 85

      This Report and Recommendation is made to the Honorable Anne Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

      Before the court is the motion for summary judgment filed by defendants Larry Williamson, M.D., and Emily Feely, M.D. (ECF Nos. 85, 85-1 to 85-3.) Plaintiff filed a response. (ECF No. 92.) Defendants filed a reply. (ECF No. 97.)

      After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

      Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983; however, the events giving rise to this action took place while Plaintiff was a pretrial detainee at the Clark County Detention Center (CCDC). (Compl., ECF No. 4.)

      The court screened Plaintiff's complaint, and allowed him to proceed in Count I with a claim under the Fourteenth Amendment for inadequate medical care as a pretrial detainee against Dr. Feely, Dr. Williamson, Nurse Karen, and Doe medical staff. This claim is based on allegations that they administered hydrochlorothiazide, lisinopril, and aspirin to Plaintiff for

three months before noticing that his creatine levels were too high. Plaintiff claims that after he was taken to a kidney specialist who put him on a treatment plan to reduce his creatine levels, the Defendants purposely ignored the treatment plan and continued to give Plaintiff lisinopril, which caused Plaintiff to suffer further loss of kidney function.

In Count 2, Plaintiff was allowed to proceed with retaliation and due process claims in Count 2 against defendant Costello and Doe officers.

In Count 3, Plaintiff was allowed to proceed with an excessive force claim as well as a claim for denial of access to the grievance process against Doe CERT Officers.

In Count 5, Plaintiff was allowed to proceed with a retaliation claim against defendant Franklin based on allegations that after he asked for a grievance to file against Franklin, Franklin refused to allow Plaintiff to get his medication. (ECF No. 3.)

Nurse Karen, the Doe medical staff members, the Doe officers and Doe CERT officers have been dismissed without prejudice for lack of timely service. (ECF Nos. 48, 53.)

Dr. Feely and Dr. Williamson move for summary judgment, arguing: (1) Plaintiff failed to exhaust his administrative remedies; and (2) Plaintiff received appropriate care from Defendants, and no act or omission by Defendants caused or contributed to Plaintiff's kidney failure.[1]

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the

---

[1] Defendants Costello (ECF No. 87) and Franklin (ECF No. 88) have also filed motions for summary judgment, and each motion will be addressed in a separate report and recommendation.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Standard for a Claim of Inadequate Medical Care by a Pretrial Detainee**

"Individuals in state custody have a constitutional right to adequate medical treatment." *Sandoval v. County of San Diego,* 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). "For inmates serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment." *Id*. "However, pretrial detainees have not yet been convicted of a crime and therefore are not subject to punishment by the state. Accordingly, their rights arise under the Fourteenth Amendment's Due Process Clause." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36, n. 16).

A claim of deficient medical care brought by a convicted prisoner is governed by the subjective deliberate indifference standard. *Id*. (citations omitted). Courts previously used that standard to evaluate the claims of inadequate medical care raised by pretrial detainees. *See id*. at 668. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that a pretrial detainee's claim of excessive force was not analyzed under the Eighth Amendment, but under an objective reasonableness standard under the Fourteenth Amendment. *Kingsley*, 576 U.S. at 396-97.

In *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), the Ninth Circuit held as a result of *Kingsley,* a pretrial detainee's failure to protect claim should be analyzed under an objective reasonableness standard. *Castro*, 833 F.3d at 1071.

In *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), the Ninth Circuit concluded that "claims for violations of the right to adequate medical care brought by pretrial detainees against individuals under the Fourteenth Amendment must [also] be evaluated under an

1    objective deliberate indifference standard[.]" 888 F.3d at 1124-25 (internal quotation marks and

2    citation omitted). The elements of such a claim are:

3                    (i) the defendant made an intentional decision with respect to the
                     conditions under which the plaintiff was confined; (ii) those
4                    conditions put the plaintiff at a substantial risk of suffering serious
                     harm; (iii) the defendant did not take reasonable available
5                    measures to abate that risk, even though a reasonable official in the
                     circumstances would have appreciated the high degree of risk
6                    involved—making the consequences of the defendant's conduct
                     obvious; and (iv) by not taking such measures, the defendant
7                    caused the plaintiff's injuries.

8    *Id*. With respect to the third element, the conduct must be "objectively unreasonable, a test that

9    will necessarily turn[ ] on the facts and circumstances of each particular case." *Id*. (internal

10   quotation marks and citation omitted).

11           "The mere lack of due care by a state official does not deprive an individual of life,

12   liberty or property under the Fourteenth Amendment." *Id*. at 1125 (internal quotation marks and

13   citations omitted). "Thus, the plaintiff must prove more than negligence but less than subjective

14   intent—something akin to reckless disregard." *Id*. (internal quotation marks and citation

15   omitted).

16   **B. Facts**

17           On January 6, 2018, James Duke, an emergency medical technician, performed a

18   receiving screening at CCDC. Plaintiff's blood pressure was 170/103. No medical history or

19   medications were reported. (ECF No. 85-1 at 3-8.)

20           On January 6, 2018, Eric Lopez, a physician's assistant, reviewed the receiving screening

21   and mental health screening. (*Id*. at 9.) He noted that Plaintiff's blood pressure was elevated at

22

23

booking. (*Id.*) Lopez prescribed amlodipine[2] 5 mg, once a day; aspirin, 81 mg, once a day; and clonidine[3], .1 mg, twice a day. (*Id*. at 10.) The plan was for Plaintiff to be placed on sick call. (*Id*. at 9.)

Progress notes reflect that Plaintiff's blood pressure was initially checked twice a day. (*Id*. at 14-15.) On January 11, 2018, Dr. Williamson noted he had reviewed Plaintiff's blood pressure. (*Id*. at 16.) He increased the dose of amlodipine to 10 mg, once a day, and indicated that he would follow Plaintiff's blood pressure. (*Id*.)

On January 17, 2018, Plaintiff saw Dr. Williamson for a chronic care visit regarding his hypertension. His blood pressure was elevated at 188/123. Dr. Williamson noted Plaintiff had been compliant with his medication. Plaintiff was concerned that his blood pressure remained high. Dr. Williamson prescribed hydrochlorothiazide[4] and ordered various laboratory tests. He also ordered blood pressure checks every Monday, Wednesday and Friday. He noted that if the blood pressure remained elevated, he would start Plaintiff on lisinopril[5] at 5 mg, and increase the medication as necessary to 20 mg per day. (*Id*. at 17-24.)

On January 23, 2018, Dr. Williamson reviewed Plaintiff's blood pressure checks, noting that the readings remained high. He prescribed lisinopril at 5 mg, once a day. (*Id*. at 25.)

---

[2] Amlodipine (brand names Amvaz, Katerzia, and Norvasc) is used to treat high blood pressure. *See* Amlodipine: MedlinePlus Drug Information, last visited April 19, 2022.

[3] Clonidine is another medication used to treat high blood pressure. *See* Clonidine: MedlinePlus Drug Information, last visited April 19, 2022.

[4] Hydrochlorothiazide is another medication used to treat high blood pressure as well as edema. *See* Hydrochlorothiazide: MedlinePlus Drug Information, last visited April 19, 2022.

[5] Lisinopril is a medication used to treat high blood pressure and heart failure. It is an angiotensin-converting enzyme (ACE) inhibitor. *See* Lisinopril: MedlinePlus Drug Information, last visited April 19, 2022.

On February 8, 2018, Dr. Williamson reviewed Plaintiff's blood pressure, noting it was still somewhat elevated. The doctor increased the lisinopril dose to 10 mg, once a day, and added aspirin at 81 mg, once a day, and continued to monitor the condition.  (*Id*. at 10, 26.)

Dr. Williamson reviewed Plaintiff's blood pressure on February 22, 2018, noting that Plaintiff was still not normotensive. The plan was to increase the dose of lisinopril to 20 mg per day, to check the blood pressure once a week, and to review the results again in three weeks. (*Id*. at 10, .26)

On March 15, 2018, Dr. Williamson reviewed Plaintiff's blood pressure, noting it was still "a bit high."  The doctor increased the lisinopril to 40 mg, once a day, and he continued to monitor the condition. (*Id*. at 26.)

On April 5, 2018, Dr. Williamson reviewed Plaintiff's blood pressure readings, noting they were "near normal." Lab tests were ordered at the chronic care visit. (*Id*.)

On April 11, 2018, Dr. Williamson reviewed the laboratory tests for samples collected on April 9, 2018. The creatinine was elevated at 4.27 (reference range of .70-1.3); the blood urea nitrogen (BUN) was elevated at 43 (reference range of 9-23); the estimated glomerular filtration rate (eGFR) was low at 20 (reference range of $\geq 60$); and the potassium was slightly elevated at 5.7 (reference range of 3.5-5.5). (*Id*. at 27-28.)

On that same day, Christhian Pineda-Ruiz, a medical assistant, noted a STAT comprehensive metabolic panel (CMP) was ordered. (*Id*. at 26.) The results indicated that the BUN was high at 48; the creatinine was high at 4.8; and the glucose was high at 122 (reference range of 70-110). (*Id*. at 29.) Andrea Balogh, a physician's assistant, arranged for Plaintiff to be sent to the emergency room at University Medical Center (UMC) due to the abnormal lab findings which indicated kidney disease. (*Id*. at 30-32.)

Plaintiff saw Steven R. Hamel, a nurse practitioner, in the emergency room at UMC. Hamel described Plaintiff as healthy. Plaintiff denied any current complaints. He reported no history of kidney disease. His blood pressure was 115/72. Mr. Hamel performed a physical examination, which was normal. He also reviewed lab test results. Plaintiff's BUN was elevated at 46; his creatinine was elevated at 4.6; the eGFR was 15. Mr. Hamel noted the results were consistent with an acute kidney injury. Plaintiff was admitted to the hospital for a workup for his acute renal failure and for a nephrology consult. Plaintiff saw nephrologist, Raj Singh, M.D., on April 12, 2018, for a consultation. A rental ultrasound was performed which showed mildly echogenic appearing kidneys and no collecting system dilation. Dr. Singh assessed Plaintiff with either acute kidney injury or chronic kidney disease, hypertension, and acidosis. A chronic kidney disease workup was ordered. (*Id.* at 33-43.)

Plaintiff was discharged on April 18, 2018. The discharge summary states Plaintiff believed he was on hydrochlorothiazide, but it was documented he was on amlodipine. He was diagnosed with acute or chronic kidney disease. The summary states he had elevated blood pressure, and his medications were adjusted based on kidney failure. He was given intravenous fluids, but there was no improvement in his creatinine level. A renal consult and workup were performed to evaluate kidney failure, and all were negative. Plaintiff was instructed to follow up with a nephrologist as an outpatient. The discharge summary lists the diet as "RENAL." The discharge summary noted the following home medication instructions: amlodipine 10 mg daily for 30 days; aspirin 81 mg daily, cholecalciferol (vitamin D3) 1000 units, twice a day for 30

days; metoprolol[6] 25 mg, twice a day for 30 days; and sodium bicarbonate[7] 650 mg, two tablets, three times a day for 30 days. The discharge diagnoses were acute renal failure superimposed on stage IV chronic kidney disease; renovascular hypertension; hyperlipidemia; (resolved) non-traumatic rhabdomyolysis; secondary hyperparathyroidism; and vitamin D deficiency. (*Id*. at 44-47.)

Plaintiff returned to CCDC and saw Dr. Williamson the following day. Plaintiff claimed at the hospital he was told that long-term use of aspirin caused him to have renal failure. He stated he had a "whole battery of tests" when he was released from the Indiana prison system in September of 2017, and there were no abnormalities at that time. He believed something, probably a medication, caused his kidneys to fail. He asked for a list of medications he was taking prior to his hospitalization. (*Id*. at 54.) Plaintiff's blood pressure was 149/105. He was assessed with stage 4 renal failure. (*Id*.) Dr. Williamson reviewed the medications Plaintiff was taking prior to his medications, which included lisinopril 40 mg, HCTZ (hydrochlorothiazide) 25 mg, and ASA (aspirin) 81 mg. He also had an as needed order for clonidine. Dr. Williamson placed a referral with Dr. Feely, a nephrologist. (*Id*. at 55.)

On April 24, 2018, Dr. Williamson reviewed Plaintiff's blood pressure, noting it had improved. He said he would order post-hospitalization laboratory tests and would review Dr. Feely's consultation when it was available. (*Id*. at 54.) Dr. Williamson reviewed the lab results on April 25, 2018, which showed the creatinine was elevated 3.77; the eGFR was low at 23; and the BUN was elevated at 40. (*Id*. at 56-57.)

---

[6] Metoprolol is used to treat high blood pressure, to prevent chest pain, improve survival after heart attack and to treat heart failure. It is a beta blocker. *See* Metoprolol: MedlinePlus Drug Information, last visited April 19, 2022.

[7] Sodium bicarbonate is an antacid used to relieve heartburn and acid indigestion. *See* Sodium Bicarbonate: MedlinePlus Drug Information, last visited April 19, 2022.

1    Plaintiff sent a medical request on April 26, 2018, complaining of pitting edema in his

2  legs as they appeared swollen and filled with fluid. Plaintiff was advised he was scheduled to see

3  Dr. Feely. (*Id*. at 58.)

4    Plaintiff saw Dr. Feely via telemedicine on April 27, 2018, for his recent diagnosis of

5  renal disease. Plaintiff reported he was released from prison in Indiana in September of 2017,

6  and at that time all of his laboratory tests were normal. He denied a history of hypertension prior

7  to incarceration within CCDC in January of 2018, and reported he had never been told of issues

8  with his kidneys. Plaintiff denied a family history of renal disease and denied a history of

9  substance abuse other than marijuana. He reported that he felt well, but did have lower extremity

10  edema for three to four days.

11    An exam was performed by an on-site nurse, and his blood pressure was 134/84.

12  Dr. Feely assessed Plaintiff with acute or chronic renal failure, noting that his history leaned

13  toward this being acute kidney injury, but she would need records from Indiana to determine his

14  baseline renal function. She indicated that his creatinine was a bit better than when he was

15  hospitalized, and his urine was pretty bland, but his renal ultrasound findings and elevated iPTH[8]

16  were concerning for chronic disease. With the new lower extremity edema, she would check the

17  urinalysis with protein/creatinine ratio and urine eosinophils. If he developed worsening

18  proteinuria (nephrotic range), he would need a renal biopsy to further determine the cause of his

19  renal disease. He was instructed to continue vitamin D replacement, sodium bicarbonate and

20  blood pressure management with his current medications, and follow up in four weeks. (*Id*. at

21  59-60.)

22

23

---

[8] iPTH is the intact parathyroid hormone. *See* Parathyroid Hormone (PTH) Test: MedlinePlus Medical Test, last visited April 19, 2022.

Plaintiff submitted an inmate request/grievance on April 28, 2018, claiming Dr. Feely told him he was being taken off all his blood pressure medications because they were causing an allergic reaction to his kidneys and his creatinine level to skyrocket and damage his kidneys. He said he had refused his blood pressure medication since that time at her request, and his blood pressure had been fine since stopping the medication. A provider responded there was no documentation Dr. Feely recommended discontinuation of the blood pressure medications, and he was advised to complete a release of responsibility form if he chose to refuse the medications. (*Id*. at 613.)

On April 30, 2018, Dr. Williamson noted he had reviewed Dr. Feely's note and plan, and said he would continue to follow Plaintiff with Dr. Feely. (*Id*. at 59.)

On May 3, 2018, Dr. Feely reviewed laboratory test results. Plaintiff's creatinine was elevated at 3.91; the eGFR was low 22; the BUN was elevated at 35; and urinalysis showed elevated protein at 35 (reference range of 4-14). (*Id*. at 62-63.)

On May 5, 2018, Plaintiff sent a medical request to have blood drawn to assess his creatinine level. A provider responded that the testing was done on May 3. (*Id*. at 64.)

On May 6, 2018, Plaintiff submitted a medical request complaining of severe pain and aching in his kidney region since May 1. A provider responded that ibuprofen had been ordered for the pain, and Plaintiff was scheduled to review the lab test results. (*Id*. at 65.) On May 9, 2018, Kevin Sarna, a physician's assistant, prescribed ibuprofen, 200mg, three times a day. (*Id*. at 66.)

On May 10, 2018, Horace Tadeo, RN, saw Plaintiff on sick call. Plaintiff complained of pain in the lower right and left quadrants, and he thought it might be caused by the medication he was taking. The physical examination was normal. He was given acetaminophen, 325 mg, twice

a day, and aluminum-magnesium-simethicone (Mylanta) 200-200-20 MG/5ML, three times a day. (*Id*. at 66-67.)

On May 19, 2018, Plaintiff sent a medical request asking for refills for his blood pressure medication which he claimed had expired. He also asked for blood pressure checks and lab tests to assess his creatinine level and his kidney failure condition. A provider responded that lab tests were ordered. (*Id*. at 68.)

On May 22, 2018, Dr. Williamson prescribed sodium bicarbonate 650 mg, three times a day; vitamin D3 1000 units, twice a day, and Mylanta, three times a day. (*Id*. at 66.)

On May 25, 2018, Dr. Williamson reviewed Plaintiff's lab results which showed creatinine was elevated at 3.61; eGFR was low at 24; and BUN was elevated at 35. (*Id*. at 69-70)

Plaintiff saw Dr. Williamson on May 30, 2018, for a chronic care visit. Plaintiff was worried his kidney function was declining. Dr. Williamson ordered new lab tests and advised he would see Dr. Feely in the near future. (*Id*. at 71-78.)

On June 6, 2018, Dr. Williamson reviewed Plaintiff's records from the Indiana Department of Corrections, and he noted there were no laboratory test results included, but the records provided did not identify any significant health issues. (*Id*. at 79.)

On June 12, 2018, Plaintiff submitted a grievance requesting blood pressure checks three times day, as well as blood tests and urinalysis every two weeks. A provider responded that Plaintiff had been seen on May 30, 2018, and his medical issues were addressed. (*Id*. at 110.)

Plaintiff had a telemedicine appointment with Dr. Feely on June 13, 2018. She noted the Indiana prison records were not helpful as they contained no lab results. She reviewed recent lab results which showed Plaintiff's creatinine level was slightly improved but still elevated at 3.61; his protein/creatinine ratio was .96; and his eGFR was low at 24. His blood pressure was 120/70.

1    The doctor assessed Plaintiff with stage IV chronic kidney disease with proteinuria, a vitamin D

2    deficiency, hypertension, and iron deficiency anemia.  She advised the renal disease appeared to

3    be chronic, noting his eGFR was still low, and the ultrasound revealed small kidneys for his size

4    and changes consistent with renal disease. Given his young age and significant proteinuria, the

5    doctor felt a renal biopsy was needed to evaluate for a treatable cause of his renal disease. She

6    felt it was likely an underlying FSGS (focal segmental glomerulosclerosis)[9] or MCD (Minimal

7    Change disease)[10] picture. She stated Plaintiff might benefit from steroids, but she would check

8    the "coags" and repeat the CBC and schedule the renal biopsy. His blood pressure was controlled

9    on the current medications. He was to start iron for iron deficiency and repeat his vitamin D

10    levels. (*Id*. at 80-81.) In an addendum to her note, the doctor prescribed lisinopril (10mg once a

11    day) and discontinued metoprolol and sodium bicarbonate. (*Id*. at 80.)

12         On June 18, 2018, lab results showed Plaintiff's creatinine was elevated at 4.35; his e-

13    GFR was low at 20; and his BUN was elevated at 35. (*Id*. at 82-83.) On June 22, 2018, Dr. Feely

14    reviewed Plaintiff's lab results. His international normalized ratio (INR) was low at .93

15    (reference range 2-3). (*Id*. at 84.) On June 26, 2018, Dr. Williamson reviewed Plaintiff's lab

16    results, and his creatinine was elevated at 3.52; his eGFR was low at 25; and his BUN was

17    elevated at 25. (*Id*. at 85-86.)

18         On June 27, 2018, Dr. Williamson reviewed Plaintiff's blood pressure readings.

19    Dr. Williamson noted that lisinopril had been started on June 13, 2018, and his blood pressure

20    readings were only slightly elevated. Plaintiff was to follow up with Dr. Feely regarding his renal

21

22    [9] FSGS is scar tissue in the filtering unit of the kidney. *See* Focal segmental glomerulosclerosis: MedlinePlus Medical Encyclopedia, last visited April 19, 2022.

23    [10] MCD is a kidney disorder that can lead to nephrotic syndrome. *See* Minimal change disease: MedlinePlus Medical Encyclopedia, last visited April 19, 2022.

biopsy (which had been performed on June 26, 2018), and Dr. Williamson would re-evaluate his blood pressure checks the following week. (*Id*. at 87.)

Plaintiff saw Dr. Feely via telemedicine on July 5, 2018. She had not yet obtained the pathology results from the renal biopsy. Plaintiff reported improvement in frothy urine, energy, and edema in the legs. He had no complaints at that time other than wanting to get out of medical housing. The doctor assessed Plaintiff's renal disease was chronic, but she was awaiting pathology for further plans. Dr. Feely increased his lisinopril dose to 20 mg, once a day, for improved blood pressure control. Plaintiff was also to introduce oral iron for 30 days, and repeat the vitamin D levels. (*Id*. at 88-89.)

 The diagnoses from the pathology report were focal and segmental glomerulosclerosis, perihilar variant, favor secondary; severe glomerulosclerosis (91%) and interstitial fibrosis; and mild to moderate arterio and arteriolonephrosclerosis. (*Id*. at 90-92.)

On July 10, 2018, Dr. Williamson noted Plaintiff was normotensive on his current medication, but the doctor added amlodipine. (*Id*. at 66, 88.)

Plaintiff saw Dr. Feely via telemedicine on July 13, 2018. She explained the renal biopsy results and advised Plaintiff that no further aggressive treatment was indicated. The doctor said the kidney disease would be progressive; however, she hoped he would have a year or more before needing dialysis. She advised Plaintiff to discuss renal transplant donor options with his family, and Plaintiff reported he had several family members who were interested. Plaintiff's blood pressure was 128/85. Dr. Feely indicated the biopsy confirmed her suspicion that the renal disease was advanced.  No treatment, other than angiotensin converting enzyme inhibitors (ACEI) and risk factor modification, was indicated. Plaintiff was to continue on his current medications and perform follow-up labs. The assessment included stage IV chronic kidney

disease with biopsy proven secondary FSGS and severe glomerulosclerosis and interstitial fibrosis; vitamin D deficiency; hypertension; and iron deficiency anemia. (*Id*. at 93-94.)

Plaintiff saw Dr. Feely again on August 2, 2018. Plaintiff complained of edema in the legs, which was made worse by his shoes, and he requested recreational shoes. Plaintiff's blood pressure was 134/86. Dr. Feely noted the leg edema could be from the underlying renal disease or related to the amlodipine (Norvasc). The plan was to discontinue amlodipine and increase the lisinopril dose to 20mg, twice a day, and to start him on lasix[11] at 40 mg per day. She also approved Plaintiff to wear his recreational shoes. His vitamin D levels were normal, so that was discontinued. His other labs would be repeated. (*Id*. at 96-97.)

On August 4, 2018, Nurse Tadeo discussed renewal of Plaintiff's medications with Dr. Williamson. (*Id*. at 96.) Dr. Williamson prescribed ferrous sulfate[12], 325 (65 Fe) MG, twice a day. (*Id*. at 66.)

On August 7, 2018, Dr. Feely reviewed lab results which showed Plaintiff's creatinine was elevated at 3.99; his eGFR was low at 22; BUN was low at 8; iron was normal at 75 (reference range 65-175). (*Id*. at 99-101.)

Plaintiff saw Dr. Feely on September 6, 2018. She noted Plaintiff's leg edema had resolved after amlodipine was discontinued and lasix was added. Plaintiff reported feeling well and was working out regularly and playing basketball. Repeat labs ensured the stability of his renal function. His blood pressure was typically well-controlled, so those medications were not adjusted. The plan was to continue the current medications and repeat lab tests. (*Id*. at 102-103.)

[11] Lasix (or Furosemide) is used to treat high blood pressure and edema. It is a diuretic. *See* Furosemide: MedlinePlus Drug Information, last visited April 19, 2022.

[12] This is an iron supplement used to treat or prevent anemia. *See* Iron Supplements: MedlinePlus Drug Information, last visited April 19, 2022.

16

1    On September 11, 2018, Dr. Feely reviewed Plaintiff's lab results, which showed his

2 creatinine was elevated at 4.66; his eGFR was low at 19; his BUN was elevated at 44. (*Id*. at

3 104-106.)

4    Plaintiff saw Dr. Feely on October 4, 2018. He reported feeling well, with an excellent

5 energy level. His blood pressure remained controlled on his medications, which he was tolerating

6 well. She reviewed his lab results which showed creatinine at 4.38; eGFR at 20; iPTH at 173.

7 The plan was to start calcitriol[13] for the elevated iPTH and follow up in December (if he was still

8 incarcerated), and she would follow his calcium levels with the addition of this medication. (*Id*.

9 at 66, 107-108.)

10    Plaintiff left the custody of CCDC on November 8, 2018.

11 **C. Analysis**

12    Defendants provide the expert report of Dr. James Felt, who is board certified in internal

13 medicine and nephrology, in support of their argument that they were not objectively deliberately

14 indifferent to Plaintiff's medical needs. Dr. Felt opines that the management of Plaintiff's kidney

15 disease met the standard of care.

16        [Plaintiff] presented to the [Defendants] with no prior medical
         history, on no medications, and was not known to have any kidney
17       problems. He was found to have high blood pressure and was
         immediately started on medication and followed closely. Based on
18       subsequent exams and blood pressure readings his medications
         were adjusted with a diligent attempt to achieve satisfactory blood
19       pressure control. This objective was achieved to a large degree and
         his blood pressure was very closely monitored throughout the
20       period of time he was under the care of the above physicians.

21 (ECF No. 85-1 at 112.)

22

---

23 [13] Calcitriol is used to treat and prevent low levels of calcium and bone disease in patients whose
kidneys are not working properly. *See* Calcitriol: MedlinePlus Drug Information, last visited
April 19, 2022.

1    Dr. Felt further opines that no act or omission by Dr. Williamson or Dr. Feely caused or

2  contributed to Plaintiff's kidney failure.

3    When laboratory tests were obtained and his kidney function was
     found to be impaired, the patient was referred to a local hospital
4    where appropriate studies were obtained including kidney
     ultrasound that revealed pre existing kidney disease, as evidenced
5    by reduced kidney size. He was discharged on medications with
     plans for follow up with a nephrologist. He continued to have close
6    monitoring and blood pressure readings with adjustment of
     medications as needed to control his pressure. He was then seen in
7    consultation by Dr. Feely for nephrology evaluation. Appropriate
     medications and followup was prescribed. Furthermore, during his
8    care, his renal function actually improved a bit despite his chronic
     kidney disease, indicating the beneficial nature of his therapy,
9    specifically close blood pressure monitoring and control.

10 (*Id.*)

11   Subsequently, he underwent a kidney biopsy that showed severe,
     chronic glomerulonephritis… 'Focal and segmental
12   glomerulosclerosis, perihilar variant.' 'Severe glomerulosclerosis
     (91%) and interstitial fibrosis.' These terms indicate the presence
13   of a long standing chronic kidney condition. Specifically
     'glomerulosclerosis' is a term that refers to scarred and defunct
14   glomeruli, a condition that can take many months to years to
     develop. 'Interstitial fibrosis' is another term that indicates severe
15   chronicity of his condition. Furthermore this condition, focal
     sclerosis, with this degree of chronicity is not a curable condition
16   and progresses despite appropriate medical care. The best
     treatment for this condition is good blood pressure control that was
17   initiated upon first contact [Plaintiff] had with the institution and
     this treatment was continued throughout.

18  (*Id.* at 112-113.)

19   Plaintiff argues that Defendants disregarded risks with administration of lisinopril; failed

20 to prescribe a low sodium or renal diet; failed to treat him with a steroid; and failed to place a

21 catheter or fistula and place him on hemo-dialysis therapy. Plaintiff asserts this conduct caused

22 or contributed to his loss of kidney function.

23

Plaintiff asserts that Defendants failed to perform lab assessments in the first few weeks it was administered to ensure there were no adverse effects on his kidneys. However, the evidence reflects there was no indication when Plaintiff was started on lisinopril that he had any issues with his kidneys. Plaintiff claims that Defendants interfered with the prescribed plan of care at UMC by placing him back on the drug. However, there are no statements in the records from UMC that Plaintiff should not be placed on lisinopril. Plaintiff was placed on different blood pressure medications at UMC, but the discharge summary indicates those medications were for a period of 30 days. Dr. Feely put Plaintiff back on lisinopril almost two months after he had been discharged from UMC.

Plaintiff further contends that the doctor at UMC told him that lisinopril was likely the cause of his renal failure, but this is inadmissible hearsay. Plaintiff similarly claims that Dr. Bryant at HDSP told him that he should not have been on lisinopril because of his race and because it can impair kidney function. This is also inadmissible hearsay.

Plaintiff asserts that Defendants failed to prescribe a low sodium or renal diet. There is no evidence in the record that Plaintiff ever told either Dr. Williamson or Dr. Feely that he was not getting a low sodium or renal diet, or that the lack of such a diet contributed to his kidney condition.

Plaintiff argues that Defendants failed to treat him with a steroid. On July 13, 2018, Dr. Feely said that Plaintiff *might* benefit from a steroid, but she was going to wait for additional labs and the results of his renal biopsy. Once his renal biopsy came back, the doctor determined that no further aggressive treatment was indicated other than ACEI inhibitors. There is no evidence in the record that not placing him on a steroid caused or contributed to his kidney condition.

Finally, Plaintiff claims that Defendants are liable because they failed to place a catheter or fistula and put him on hemo-dialysis therapy. On July 13, 2018, Dr. Feely advised Plaintiff that his kidney disease would be progressive, but she hoped it would be a year or more before he even needed dialysis. There is no evidence in the record that the failure to proceed immediately with dialysis caused or contributed any kidney function deterioration.

In sum, Defendants have presented evidence that they were objectively reasonable in treating Plaintiff's hypertension and then his kidney disease, and their conduct did not cause or contribute to Plaintiff's kidney function. The objective medical evidence demonstrates that Plaintiff's kidney disease was advanced and chronic. Plaintiff has presented only his speculation that lisinopril caused his renal failure, and that additional measures would have improved his condition. This is insufficient to defeat Defendants' motion for summary judgment. Therefore, summary judgment should be granted in Defendants' favor. In light of this conclusion, the court will not address Defendants' other arguments.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** the motion for summary judgment (ECF No. 85) of Dr. Williamson and Dr. Feely.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: April 22, 2022

Craig S. Denney
United States Magistrate Judge