1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JAMES EDWARD SCOTT,

Plaintiff,

v.

NAPHCARE, et al.,

Defendants.

Case No. 3:19-cv-00347-ART-CSD

ORDER REGARDING REPORT AND RECOMMENDATIONS ECF NOS. 112, 113, 114

## I. SUMMARY

*Pro se* Plaintiff James Edward Scott ("Scott"), an inmate in the custody of the Nevada Department of Corrections ("NDOC"), brings this action under 42 U.S.C. § 1983 against Defendants Larry Williamson, M.D. ("Dr. Williamson"), Emily Feely, M.D. ("Dr. Feely"), Joshua Costello ("Costello"), and Officer Franklin ("Franklin") for events that transpired while Scott was a pretrial detainee at the Clark County Detention Center ("CCDC"). (Compl., ECF No. 4). Before the Court are three Reports and Recommendations ("R&R"s) of United States Magistrate Judge Craig S. Denney recommending the Court grant Drs. Williamson and Feely's Motion for Summary Judgment (ECF No. 112), grant Costello's Motion for Summary Judgment (ECF No. 113) and deny Franklin's Motion for Summary Judgment (ECF No. 114). Scott had until May 6, 2022, to file an objection. To date, no objections have been filed. This Court agrees with Judge Denney's recommendations as to Defendants Dr. Feely, Costello, and Franklin and finds that Judge Denney did not clearly err with regard to these defendants. However, this Court also finds that Judge Denney did clearly err with regard to the recommendation as to Defendant Dr. Williamson as a dispute of material fact exists in the record as to whether Scott's kidney injury was acute or chronic.

Therefore, the Court adopts the R&Rs at ECF Nos. 113 and 114, and adopts-in-part and rejects-in-part the R&R at ECF No. 112.

## II. BACKGROUND

### A. Facts Relevant to ECF No. 112

The Court incorporates by reference Magistrate Judge Denney's recitation of Scott's allegations in his complaint (ECF No. 4) provided in the R&R (ECF No. 112) with the following notes regarding the care given to Scott and the character of his kidney injury.

On January 17, 2018, Dr. Williamson saw Scott for a chronic care visit regarding his hypertension. Scott's blood pressure was high at 188/123 and the notes indicate that Scott was concerned about his high blood pressure. (ECF No. 85-1 at 17-24). Dr. Williamson noted that he would start Scott on lisinopril if his blood pressure remained elevated and ordered several laboratory tests (*Id.* at 22), including a "BMP" or "Basic Metabolic Panel"—a panel of tests including creatinine levels that indicate "waste products removed from your blood by your kidneys." National Library of Medicine, *Basic Metabolic Panel*, MEDLINEPLUS (Mar. 9, 2021), https://medlineplus.gov/lab-tests/basic-metabolic-panel-bmp/ (last visited December 19, 2022). "A BMP is used to check different body functions and processes, including: kidney function. . . ." (*Id.*). Scott avers that no laboratory tests were performed until April 9, 2018—more than three months after he entered CCDC. (ECF No. 92 at 5). While Defendants Drs. Williamson and Feely note that laboratory tests were ordered on January 17, 2018, no results from these tests appear in the record. (*See* ECF No. 85 at 3). The earliest laboratory tests in Scott's medical records are dated April 9, 2018. (ECF No. 85-1 at 27).

On January 23, 2018, Dr. Williamson reviewed Scott's blood pressure readings, which remained elevated. He prescribed lisinopril at 5mg, once a day. (ECF No. 85-1 at 25). Sixteen days later, on February 8, 2018, Dr. Williamson noted that Scott's blood pressure was still high and doubled Scott's lisinopril dose

to 10 mg per day. (*Id.* at 26). Fifteen days later, on February 23, 2018, Dr. Williamson again noted Scott's hypertension and again doubled his dose of lisinopril to 20 mg a day. (*Id.* at 26). Twenty days later, on March 15, 2018, Dr. Williamson again doubled Scott's lisinopril dose to 40 mg a day after finding Scott's blood pressure remained "a bit high." (*Id.*).

When Scott was transported to University Medical Center's ("UMC") Emergency Room on April 11, 2018, UMC staff noted that "Patient will require admission to the hospital for further workup regarding his acute renal failure." (ECF No. 85-1 at 39). UMC nephrologist Raj Singh, M.D. performed a renal ultrasound on April 12, 2018, and Scott claims Dr. Singh told him that the 40 mg daily lisinopril "could be causing abnormalities in your kidney function." (ECF No. 92 at 6).

When Scott was discharged from UMC on April 18, 2018. His "principal discharge diagnosis" was "acute renal failure superimposed on stage 4 chronic kidney disease (CMS/HCC)." (*Id.* at 44). UMC staff adjusted Scott's medications "based on kidney failure" (*Id.*) and did not prescribe him lisinopril. (*Id.* at 46-47).

Upon return from UMC, Scott told Dr. Williamson he believed a medication caused his kidney failure in part because tests performed when he was released from the Indiana prison system four months prior to his incarceration at CCDC allegedly showed no abnormalities. (*Id.* at 60). Dr. Williamson referred Scott to a nephrologist—Dr. Feely. (*Id.*).

Dr. Feely saw Scott via telemedicine on April 27, 2018. Her notes indicate that based on Scott's history "this leans toward being an AKI [Acute Kidney Injury] but would need records from Indiana to confirm." (*Id.*). The Indiana penitentiary provided minimal documentation that neither disclosed any significant health issues nor included any test results. (*Id.* at 79).

Scott had another telemedicine appointment with Dr. Feely on June 13, 2018. (*Id.* at 80-81). Dr. Feely's noted that "[Scott's] renal disease appears to be chronic"

and "suspect[ed] that this has been going on for a while." (*Id.* at 81). She assessed him with "CKD [Chronic Kidney Disease] IV with proteinuria" and ordered a renal biopsy. (*Id.* at 80-81). Dr. Feely prescribed Scott lisinopril at 10 mg per day and discontinued metoprolol as prescribed by UMC. (*Id.* at 80). When Dr. Feely reviewed the results of the biopsy with Scott on July 13, 2022, she noted that the biopsy showed "severe glomerulosclerosis (91%) with interstitial fibrosis and mild-moderate arteriolonephrosclerosis. Secondary FSGS [Focal Segmental Glomerulosclerosis] was found but the cause is obviously unknown." (*Id.* at 93-94).

After Scott left the custody of CCDC on November 8, 2018, he was transferred to High Desert State Prison ("HDSP"). Scott met with Dr. Bryant at HDSP. (ECF No. 92 at 8). Scott alleges Dr. Bryant told him: 1) lisinopril should not have been prescribed to Scott because he was Black and lisinopril is less effective in Black patients than in White patients; 2) lisinopril can raise creatinine levels "by allocating blood away from your kidneys and can impair your kidney function"; 3) lisinopril can cause kidney failure. (*Id.* at 8-9). Scott alleges Dr. Bryant discontinued lisinopril and prescribed Scott Norvasc and metoprolol. Based on this consultation with Dr. Bryant, Scott "realized his civil rights may have been violated" by Drs. Williamson and Feely, and took steps to initiate this lawsuit. (*Id.* at 9).

Defendants' expert Dr. James Felt concluded the biopsy results indicated "the presence of a long standing chronic kidney condition" that could have taken "many months to years to develop." (*Id.* at 112-113). Dr. Felt opined that the management of Scott's kidney disease met the standard of care. (*Id.*).

The National Institute of Health's ("NIH's") fact sheet on lisinopril notes "impaired renal function" under the heading "precautions" where it explains that "treatment with angiotensin converting enzyme inhibitors, including lisinopril, may be associated with oliguria and/or progressive azotemia and rarely with

acute renal failure. . . ." (ECF No. 92 at 48). The NIH also notes that lisinopril and other angiotensin converting enzyme inhibitors ("ACE" inhibitors) "have an effect on blood pressure that is less in black patients than in non-blacks." (*Id.* at 45).

**B. Facts Relevant to ECF No. 113**

The Court incorporates by reference Magistrate Judge Denney's recitation of Scott's allegations in his complaint (ECF No. 4) provided in the R&R (ECF No. 113), which the Court adopts.

**C. Facts Relevant to ECF No. 114**

The Court incorporates by reference Magistrate Judge Denney's recitation of Scott's allegations in his complaint (ECF No. 4) provided in the R&R (ECF No. 114), which the Court adopts.

**III.     LEGAL STANDARD**

**A. Unobjected-to Reports and Recommendations**

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where a party fails to object to a magistrate judge's recommendation, the Court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1116 (9th Cir. 2003) ("De novo review of the magistrate judges' findings and recommendations is required if, but *only* if, one or both parties file objections to the findings and recommendations.") (emphasis in original); Fed. R. Civ. P. 72, Advisory Committee Notes (1983) (providing that the Court "need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").

**B. Summary Judgment**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary

judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party satisfies Rule 56's requirements, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more

than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[V]ery little evidence [is required] to survive summary judgment in a discrimination case because the ultimate question is one that can only be resolved through a 'searching inquiry'— one that is most appropriately conducted by the fact finder upon a full record." *Reynaga v. Roseberg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017) (*quoting Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).

### C. Claim of Inadequate Medical Care by a Pretrial Detainee

In *Gordon v. Cnty. of Orange*, the Ninth Circuit set out the standard for claims of inadequate medical care brought by pretrial detainees. 888 F.3d 1118 (2018). Under *Gordon* "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Id.* at 1124 (*citing Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 170 (9th Cir. 2016). "[T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.* at 1125. To satisfy the third element, the defendant's conduct "must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case." *Id.* (*citing Castro*, 833 F.3d at 1071).

"A defendant can be liable even if he did not actually draw the inference that

the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022). The plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (*citing Castro*, 833 F.3d at 1071).

## IV. DISCUSSION

### A. Analysis of ECF No. 112

The Court concludes that Magistrate Judge Denney clearly erred with regards to his analysis of Dr. Williamson's actions.

Here, medical records show Dr. Williamson made an intentional decision to prescribe Scott lisinopril and to double Scott's lisinopril dose every few weeks—ending at the maximum allowed daily dosage of 40mg. (*See* ECF No. 92 at 56 ("maximum of 40 mg daily")). Dr. Williamson did so without any test results indicating Scott's baseline renal function despite ordering tests that would evaluate it. (ECF No. 85-1 at 22). Moreover, Dr. Williamson engaged in this escalating prescription of lisinopril despite widespread medical knowledge of both lisinopril's ineffectiveness in Black patients and the risk of prescribing lisinopril to persons with reduced kidney function as evidenced by the National Institute of Health fact sheet that Scott attached to his response to Defendants' Motion for Summary Judgment. (ECF No. 92 at 39-63).

Scott has therefore adduced sufficient evidence that an objectively reasonable caregiver would: 1) know that lisinopril is less effective in Black patients; and 2) determine baseline renal function prior to prescribing lisinopril in such high doses, especially because different lisinopril dosages are recommended for patients with differing renal function. (ECF No. 92 at 56).

Regarding the causal element of the test announced in *Gordon*, the record evidences a genuine dispute of material fact as to whether Scott's kidney injuries were acute, chronic, or whether an acute injury—perhaps caused by lisinopril,

construing all facts in favor of Scott—exacerbated an existing chronic illness. UMC staff characterized Scott's kidney injury as "acute" when he was admitted to the hospital. (ECF No. 85-1 at 39). UMC physicians diagnosed Scott with "acute renal failure superimposed on stage 4 chronic kidney disease (CMS/HCC)." (*Id.* at 44). Upon first seeing Scott, Dr. Feely believed his injury was acute but sought confirmation from Indiana penitentiary test results that never materialized. (*Id.* at 60, 79). Later, Dr. Feely believed Scott's kidney injury was chronic. (*Id.* at 81). And, Defendants' expert also concluded the injury was chronic. (*Id.* at 112-113).

In sum, Scott has presented evidence both that Dr. Williamson was objectively unreasonable in treating Scott's kidney disease and hypertension, and that a genuine dispute of material fact exists in the record as to whether Scott's kidney injury was acute, chronic, or a chronic injury exacerbated by an acute injury. Therefore, this Court denies summary judgment as to Dr. Williamson and overrules Magistrate Judge Denney's R&R (ECF No. 112) as it relates to Dr. Williamson. *See Russell v. Lumitan*, 31 F.4th 729, 736 (9th Cir. 2022) (acknowledging district court's denial of summary judgment where the evidence in the record had "two susceptible interpretations," requiring a jury to decide whether the defendants acted with deliberate indifference).

Dr. Feely, however, was not involved in Scott's plan of care until April 27, 2018—after Scott was diagnosed with stage four kidney failure by physicians at UMC. Even construing all facts in Scott's favor, as this Court must at the summary judgment stage, the record does not support a causal inference that Dr. Feely's care caused Scott's kidney injury—even accepting his argument that it was acute and caused by Dr. Williamson's prescription of lisinopril.

Therefore, this Court adopts-in-part and rejects-in-part Magistrate Judge Denney's Report and Recommendation (ECF No. 112). This Court adopts this R&R as it relates to Dr. Feely, but rejects it as it relates to Dr. Williamson.

1

**B. Analysis of ECF No. 113**

2

Because there is no objection, the Court need not conduct de novo review, and

3

is satisfied Judge Denney did not clearly err. Here, Judge Denney recommends

4

granting Costello's motion because Scott did not exhaust his administrative

5

remedies. (ECF No. 113 at 1). While Scott argues information about available

6

grievance procedures was not provided and provides declarations from other

7

individuals detained at CCDC stating the same (ECF No. 101 at 37, 39, 40), Scott

8

did file grievances while housed at CCDC, but none address the allegations

9

proceeding against Costello in the present lawsuit. (ECF No. 87-5). The Court

10

agrees with Judge Denney that the grievance process was available to Scott, but

11

he did not file a grievance concerning Costello's alleged conduct. Having reviewed

12

the R&R and the record in this case, the Court will adopt the R&R in full.

13

It is therefore ordered that Judge Denney's Report and Recommendation (ECF

14

No. 113) is accepted and adopted in full.

15

**C. Analysis of ECF No. 114**

16

Because there is no objection, the Court need not conduct de novo review, and

17

is satisfied Judge Denney did not clearly err. Here, Judge Denney recommends

18

denying Franklin's motion because Scott exhausted his administrative remedies,

19

presented a genuine dispute of material fact as to 1) whether Franklin retaliated

20

against him because Scott had requested to file a grievance against Franklin; and

21

2) whether there was a legitimate penological purpose for not allowing Scott to go

22

to the 2:30 p.m. pill call on or about May 24, 2018; and 3) whether Franklin

23

suffered damages as a result of the missed pill call. Judge Denney also found

24

Franklin was not entitled to qualified immunity. (ECF No. 114 at 9, 11, 13, 14).

25

The Court agrees with Judge Denney that Scott exhausted his administrative

26

remedies, qualified immunity does not apply to Franklin in this instance, and

27

Scott has presented genuine issues of material fact as to whether Franklin

28

retaliated against him, whether there was a legitimate penological purpose for not

allowing Scott to attend pill call, and whether Franklin suffered damages. Having reviewed the R&R (ECF No. 114). and the record in this case, the Court will adopt the R&R in full.

**V. CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that the Report and Recommendation (ECF No. 112) is therefore adopted in part and rejected in part. ECF No. 112 is adopted with regards to Dr. Feeley and rejected as to Dr. Williamson, as discussed above.

It is further ordered that the Report and Recommendation (ECF No. 113) is adopted in full.

It is further ordered that the Report and Recommendation (ECF No. 114) is adopted in full.

DATED THIS 3rd day of January 2023.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE